## NEW YORK & PENNSYLVANIA CO. et al. v. DAVIS, Director General, etc., et al.

(District Court, E. D. Pennsylvania. December 1, 1924.)

No. 2487.

Carriers ⬅195—Freight in shipment from foreign country payable at schedule rate in American money.

The freight charges on a through shipment from a foreign country into the United States are payable at the rate fixed by the tariff schedules published and filed with the Interstate Commerce Commission in money of the United States, regardless of its exchange value in money of the foreign country.

In Equity. Suit by the New York & Pennsylvania Company and others against James C. Davis, Director General of Railroads and Agent, and another. Sur motion to dismiss bill. Granted.

A. B. Hayes, of Washington, D. C., and T. D. McGlathery, of Philadelphia, Pa., for plaintiffs.

John Hampton Barnes, of Philadelphia, Pa., for defendants.

DICKINSON, District Judge. This motion is urged on nine different grounds. The approach by which one not familiar with the business of international freight shipments nor with its nomenclature must reach the questions of law which arise is doubtless painfully academic to those who know the subject. Notwithstanding this, there is no other mode of approach for the uninformed mind.

The first act of Congress (Act April 2, 1792, § 20, 1 Stat. 250 [Comp. St. § 6535]) by which our monetary system was established provided that our "money of account" should be "expressed" in words which by custom have been reduced to "dollars" and "cents." Our laws have further given substance to the things for which these words stand by defining what is their nominal value.

The Canadian law has similar provisions, and it happens that their "money of account" is "expressed" in the same words as our own.

This controversy has grown out of the fact that there is not merely a difference but

a daily varying difference between the commercial or exchangeable value of a Canadian dollar and a dollar of the United States. As our law has undertaken to regulate freight payments by prescribing that the charges must be fair and reasonable, all are agreed that the Commission alone can determine what the proper charge is, and it is prescribed by a published tariff. When transportation is made partly over Canadian and partly over our territory, the charge is established, as we understand it, if the shipment goes under a through rate, by the "through rates being set out and contained in tariffs issued by the carriers operating in the Dominion of Canada, which said tariffs have been and are duly published and filed with the Board of Railway Commissioners for Canada and with the Interstate Commerce Commission of the United States." This means, as we interpret it, that if a shipment originates in Canada and is transported by a Canadian carrier to the international boundary line and is then taken over by a United States carrier (or by two or more of them in succession) and transported to its destination in Pennsylvania, the consignee paying the freight would be informed what the lawful charge was. He would, however, be informed by the use of the words "dollars and cents," or equivalent symbols and figures. It is clear enough that before he had a real knowledge of what he was doing he must learn whether the "dollars" in which he was to pay were Canadian dollars or our dollars. The laws of the respective countries would inform him of the difference, if there was any, in the nominal values of these dollars; but the commercial or exchangeable value of each could be learned only through the exchanges, and these values vary from day to day. Moreover, the shipper or consignee paying the freight is concerned only with the sum he pays, but the carriers are concerned not only with this sum but with its apportionment among the carriers. The practical fact stares us in the face that, under conditions in which Canadian money is of less exchangeable value than our own, if the shipper pays the freight in Canadian money he pays less than the consignee pays if he pays in our money. It is equally clear there would be a like gain or loss in the settlements between or among the carriers.

As an administrative question, what should be done is affected by other considerations, among which is the effect upon shipments and the danger of the disruption of the relations of carriers with shippers and with each other now dealt with by a system which is the fruit of years of labor. The balancing of these interests calls for great nicety of adjustment. The Canadian Board has dealt with the problem, but our Commission has not. The former has met the complaints, which were felt to be well founded, by as fairly as possible but arbitrarily fixing what the rate of exchange is and when the freight is prepaid in Canadian money to permit a surcharge of an arbitrary percentage of the exchange thus determined. This additional charge, however, cannot be made if the freight is paid by the consignee in our money.

We are thus, after this lengthy preamble, brought to the consideration of the bill and the ninth ground of dismissal. The defendants read the bill, as we read it, to aver as the sole cause of action (in the sense that the plaintiffs have no cause without this) that the defendants (one during one period and the other afterwards) unlawfully exacted payment of the tariff rates in money of the United States. It follows that if it was lawful for the defendants to have so done, the bill presents no cause of action. To make this entirely clear, there is no averment of the collection of a surcharge which could not lawfully be made when the tariff charges were paid in our money. The challenge of the bill is made in these words:

"The contract, tariff and regulations under which the shipments * * * were transported must of necessity * * * call for * * * payment * * * in American dollars."

We see no way of escape from this conclusion. The laws of the United States make it lawful for the shipper or consignee to pay a prescribed sum of money and unlawful for the collecting carrier to exact more or to accept less. The sum to be thus paid and accepted is the sum set forth in published tariffs. This sum is expressed in words, directly or through conventional symbols. The words thus used are "dollars" and "cents." The sole question thus becomes what do these words mean. What is the thing called a "dollar" which is to be paid. The word is defined by law. The act of 1792, already referred to, in effect declares that our "money of account" shall "be expressed in dollars or units, dimes or tenths, cents or hundredths and mills or thousandths," etc. Usage has shortened this by the disuse of all except "dollars" and "cents." This provision of the original act has never been changed. It is, of course, perfectly obvious that these words are mere words or mere verbiage or a mode of ex-

pression, but the words are words of the language of the United States, and we must use these words whenever we express values in monetary terms when the money is the money of the United States. We say we must use these words because there are no others. Congress, by other provisions of the laws, took the word "dollar" out of the domain of verbiage and gave it substance and made of it the name of a substantial thing. What the thing is, of which a "dollar" is the name, has varied from time to time, and we now have dollars which differ in their form embodiment; but under our present laws, whatever the form, each one of these dollars is a thing which has the same commercial or exchangeable value which a minted coin of 25.8 grains of gold 900 fine has (or would have if there was one) in the marts of trade. When a freight tariff calls for the payment of $100, we see no other thing which the carrier is to receive than what a creditor would receive in payment of a hundred dollar debt. All this, of course, has the flavor of the hornbooks, but it goes to the vitals of the cause of action set up in the bill.

In reaching the conclusion stated, we are not unmindful of an at least seeming dilemma. If the delivering and collecting carrier receives the published rates in money of the United States, it is, when it comes to settle with the other carriers, confronted with a difficulty. If it transmits the Canadian charges in Canadian money, retaining the balance, it receives more than it would receive if the two kinds of money were on a parity and more than the tariff charges. If it transmits money of the United States, then the Canadian carrier receives more than it would receive if there was no difference in exchange, and likewise more than the Canadian tariff. We also do not lose sight of the thought of the injustice which is always wrought when there is a shift in the exchangeable value of money. The limits of an opinion forbid us to follow the very interesting discussion in which counsel for the plaintiffs has indulged. The remedy for the evil, if there be one, is however in the legislative and not the judicial hands. The fact is that the value of money is always in a state of flux and will be until some means has been devised to give it what is called "stability." There is not only the variations recorded in the foreign exchanges, but differences in exchangeable value at different times within the country issuing the money, evidenced by the figures which show the relation between its ex-

changeable value and the value of other things or the general price level as contrasted with its debt-paying value. In this sense $40 may discharge a hundred dollar debt at one time and $100 be required to pay a $40 loan at another. It may be due to what is commonly called a "depreciated currency" or the inability of a country to maintain the nominal value of its money. It may be due to natural causes which have affected the exchangeable value of that to which the value of the money has been referred. It may be due to changes in the law which establishes the nominal value of the money. Nothing is more common than the suspicion, however ill founded, that individuals possess and wield the power to work such changes at will and no one thing has called forth more bitter invectives. It is no fresh complaint. The prophet Amos, of old, called down maledictions upon the heads of those who made "the ephah small and the shekel great." The rate of foreign exchange may, on the other hand, be controlled wholly by the state of the trade between the two countries. In such case the difference would theoretically at least be measured by the cost of transporting gold in payment of trade balances. To whatever the difference may be due, and whatever its extent, we do not see that the fact that the difference works advantage to one or disadvantage to another changes the necessity of paying charges prescribed by law in the money of the country.

Counsel has likewise brought into the discussion by way of analogue the line of cases dealing with promises to pay in the money of one country when the promise is redeemed or is reduced to judgment in another. The attempt in all these cases is to make what is paid or the judgment which represents payment the equivalent of what was promised. A law-writer has collected all these cases and discussed them in a recent pamphlet. There is no uniformity in the rulings made, except in the one feature that whatever is paid or the judgment which is rendered must be paid or the judgment expressed in the money language of the country of payment or suit. Of course, they all hold that the payment or judgment must be based upon the exchange values of the two moneys. This, however, is because foreign money is a commodity, and a promise to pay it is a promise to deliver a commodity. It necessarily follows that in assessing damages for a default, the exchangeable value of what was not delivered must be found and translated into the money of account

of the country in which the judgment is rendered. The question before us is the different question of what shall be paid when our law commands the payment to be made in our dollars.

As this disposes of the case, there is no need to discuss the other grounds of demurrer.

Following the usual practice, no decree is now made, but a formal decree dismissing the bill for want of equity, with costs to defendants, may be submitted.