## WASHBURN–CROSBY CO. v. NORTHERN PAC. RY. CO.

(Circuit Court of Appeals, Eighth Circuit. November 17, 1926.)

### No. 7329.

Payment ⬅︎12(5)—Carriers of shipments from Canada to United States on joint through tariffs held entitled to demand payment in United States in American dollars.

Under joint through rates legally established between Canadian and American railroads on international shipments, the rates being expressed in dollars and to be divided on a percentage basis, and the carriers having the right to demand or to refuse prepayment, at a time when the exchange value of the Canadian dollar was less than that of the American dollar, and constantly fluctuating, the carriers *held* to have the right to require all payments to be made in the United States and in American dollars.

Symes, District Judge, dissenting.

In Error to the District Court of the United States for the District of Minnesota; John B. Sanborn, Judge.

Action at law by the Northern Pacific Railway Company against the Washburn-Crosby Company. Judgment for plaintiff, and defendant brings error. Affirmed.

John Junell, of Minneapolis, Minn. (J. H. Colman and Lancaster, Simpson, Junell & Dorsey, all of Minneapolis, Minn., on the brief), for plaintiff in error.

D. R. Frost, of St. Paul, Minn. (D. F. Lyons, of St. Paul, Minn., on the brief), for defendant in error.

Before STONE and LEWIS, Circuit Judges, and SYMES, District Judge.

STONE, Circuit Judge. This is an action by the Northern Pacific Railway Company against the Washburn-Crosby Company, for a balance due for freight charges on various carload shipments of grain, from points in Canada to Minneapolis, shortly prior to January 22, 1921. From a judgment, favoring plaintiff, defendant sues this writ of error.

All of these shipments were made under joint rates filed and participated in by the Canadian and American carriers moving the shipments. These rates were filed by the Canadian roads and established before the Board of Railway Commissioners of Canada and by the plaintiff before the Interstate Commerce Commission. They expressed the same amount in dollars and cents and at the time they were filed and established the Canadian and American dollars were upon a parity of value. As a result of the World War, Canadian dollars became of relatively less value than the American dollars, and, during the period of these shipments, this currency exchange value fluctuated from 8 to 17 per cent. Because of this difference in value, it became a question of substance whether freight charges on such international shipments should be paid in Canadian or American money. To meet this situation, the Canadian roads refused to accept prepayment of charges on freight moving to the United States, and the American road required prepayment of freight moving to Canada. The result of these requirements was to force payment in American money for the entire freight charge. The charges in accordance with these joint through rates were divided between the Canadian and American carriers on a percentage basis which was the result of agreement between them and did not depend entirely upon the respective length of hauls in the two countries.

Defendant claimed the right to pay in American money for that portion of the charge belonging to the plaintiff and in Canadian money, or its American equivalent in value, for that portion of the charge belonging to the Canadian road, the Canadian portion being based on the current rate of exchange between the two currencies on the day of payment. The plaintiff insisted upon its right to collect the entire charge in American money. Without prejudice to either party, the defendant paid the plaintiff the amount conceded due under its theory. This action is for the balance, representing payment of the entire charge in American money.

This question presented is simple in statement, but difficult of solution. Also it is novel and has been before the courts only in three cases. These cases are Mountain Lumber Co. v. Davis (D. C.) 9 F.(2d) 478 (Southern District New York), which was appealed to the Circuit Court of Appeals for the Second Cir-

cuit, 11 F.(2d) 219; New York & Pennsylvania Co. v. Davis (D. C.) 2 F.(2d) 858 (Eastern District Pennsylvania), which was appealed to the Circuit Court of Appeals of the Third Circuit, 9 F.(2d) 911, and New York & Pennsylvania Co. v. Davis (D. C.) 8 F.(2d) 662 (Western District New York). In both of the above cases which reached the Circuit Courts of Appeals, those courts determined that there was no right of recovery by the shipper for charges paid, because the payment had been made without protest and thereafter the divisional portion had been paid by the collecting carrier, as agent, to the Canadian roads and that an agent could not be held for a payment over to his principal, where the debtor had made no protest or claim before the payment over. As the sole ground upon which those cases were decided in those Circuit Courts of Appeals is absent here, those decisions are of no aid to us. In each of the three District Courts, the cases were ruled, not only on the above ground, but also, upon two other grounds, namely, that the Interstate Commerce rate requires payment in American money under the Commerce Act (Comp. St. § 8563 et seq.), and if that act had contemplated consideration of differences in currency exchanges on international shipments under through joint rates, such intention would have been stated in the act, therefore, the Commerce Act must be construed as requiring payment of the entire charge in American money, when payment is made in the United States; the other ground was that the place of payment, in contracts, governs the currency in which payment must be made.

Neither of these two theories is invulnerable. As to the first ground, it may well be said that Congress, when it passed the Commerce Act, had more particularly, if not entirely, in mind, purely national rates, as they constitute a vast majority of the transactions intended to be covered in the act and international rates only an incidental and relatively unimportant part and that it is rather imaginative to say that Congress had this incidental feature in mind at all. The concern of Congress was that American roads should have a fixed established interstate rate and should charge that rate and only that rate for the service which those roads furnished. As to the second ground, no quarrel can be made as to the rule of law stated, but can it be fairly said that the parties have agreed that the payment shall be made in the United States, when the shipper is insisting upon his right to payment in Canada and makes the shipment and the contract under the duress of having to accept the carrier's terms. It can hardly be said that such a contract has been freely entered in a way to bind the shipper to terms which he is strenuously opposing but is forced by circumstances, created by the carrier, to accept.

We think the determination of the trial court was right, but that there is a more real and rational basis therefor than those found sufficient by the District Courts in the above cases.

All rates are naturally and legally expressed in the currency of the country where made and established. Payments of all rate charges are made in accordance with the currency which governs that rate—the carrier may require and it must accept payment therein. No difficulty is encountered in applying this rule where the rate is purely national. Where the rate is international, there enter two special considerations which may be disturbing factors. Those are the presence of independent jurisdictions of partial control and of different national currencies. Where there is harmony in these controls and where the currencies remain normal, these factors are dormant; but where discord in controls, or where abnormal divergence in the relative currency values occurs, there arise situations peculiar to international rates. Such variances are aggravated in effect when the rate is a joint through rate of carriers of different nations and that rate is divided (as is usually true) upon a percentage basis. In such instances, divergence in currency values between the countries creates a situation which is of vital bearing and which is peculiar to such international rates. Such situations are very different from any which could arise as to purely national rates and they should be considered and determined, as they really exist, upon the particular elements and problems which they present.

When these joint rates for international shipments were filed and established with the Canadian Board and with the Interstate Commerce Commission, the standard coin (the dollar) of each country was of the same value. It made no difference, then, either to the carrier or shipper, where or in which coinage the charge was paid. While the Canadian carrier filed its tariffs in terms of Canadian dollars and the American carrier filed its tariffs in terms of American dollars, both carriers intend to specify the same value for the service and the result was as intended. Both the Board and the Commission understood this intention and this result. This intention and result was understood by the public. There was no thought that the rate would be unsta-

ble or uncertain. There was no thought that the charge under the rate should fluctuate with changes in value between the currencies of the two countries and, even upon the same shipment, be different according to the country in which the charge might be paid. No such uncertainty would have been tolerated, either by the Board or by the Commission. Suppose that the tariffs filed, at a time when the two dollars were equal, had provided that if the charge was paid in Canada the payment should be 90 per cent. of the rate, and if in the United States the full rate, can it be thought that either the Board or the Commission would have allowed such a discrimination and uncertainty to have been established? Or suppose those tariffs had then provided that the Canadian divisional of the rate should be paid only 90 per cent., while the American portion should be paid in full, would the Board have permitted it to be established? Such an arrangement would have disrupted the rate structures of all Canadian lines affected by such international business. Rate structures are not built up by each carrier acting as an isolated unit. They are formed from experience based upon all of the practical considerations which affect procurement and handling of business. One such consideration of importance is the competitive conditions which affect and often control the procurement of business—particularly between principal shipping or terminal points. A difference (as above suggested) in charge as to the Canadian haulage would directly result in favor of Canadian roads having the longest haul under the joint rates. The reaction of such a condition would be a rearrangement of tariffs to meet this new competitive feature. This would occur if the discount on the Canadian divisional portion were fixed on some definite basis. The derangement would be much more if that discount depended upon the fluctuation of a restless exchange rate which changed, not only from day to day, but within a single day (as shown by this record to be true at the time of these shipments).

Again, this constantly changing exchange rate would introduce additional confusion of its own. At what time should the rate apply —when the freight was delivered to the carrier, while it was in transit, when it reached destination, when it was delivered by the carrier, when payment of the charges was demanded or when such payment was made? Obviously, no accurate determination could be made and no arbitrary determination was allowable at the time of these shipments. Later, the Board undertook to remedy this situa-

tion by permitting Canadian carriers, when collecting charges, to add to the total through charges, a surcharge of 60 per cent. of the difference in exchange value; this percentage being based upon such difference as of the 1st and 14th of each month. Even that plan, which was stated by the Chief Commissioner to be "the best solution of the problem so far advanced by any person" was admitted by him to be imperfect, a matter of "averages" and, in some respects, arbitrary. The confusion and complexity of such a situation defied any satisfactory workable plan or adjustment. All of this confusion was occasioned by the endeavor (not blamable) of the shipper to secure the advantage of the fluctuating exchange rate by paying the charge in Canada in Canadian money. As the carriers are bound by the tariffs filed and cannot depart therefrom, the only practical way in which this confusion and discrimination could be avoided was to require all charges to be paid either in Canada or in the United States. To require payment in Canada, would discriminate against the Canadian carriers and, because the American carriers are entitled to and are required to demand payment of their part of the charge in United States money (Abrasive Co. v. Director General, 69 Interst. Com. Com'n R. 630), would result in the Canadian carriers receiving less than their real portion of the divisional charge. If the shipper has the choice of place of payment, the same result would follow, as Canada would be chosen by him. If the payment were made in the United States, the shipper would pay only the tariff rate although the charge would be higher than if paid in Canadian money and there would be no confusion or discrimination between shippers or carriers and no disturbance of Canadian tariff situations. As the Canadian carriers had the right to refuse prepayment (File No. 29674.2, Refusal of Railways to Allow Prepayment of Charges on Freight to United States, Canadian Board of Railway Commissioners) and as the United States carriers had the right to demand prepayment on freight to Canada, a legal basis existed for the carriers to meet this situation by demanding that all payments be made in the United States. This they did.

The judgment should be and is affirmed.

SYMES, District Judge (dissenting). Mere inability to agree with the views of the majority in the usual case does not, in my opinion, justify a published dissent. The instant case, however, presents an important and novel question never before decided by an

appellate court, and is not controlled by precedent. For this reason a brief expression of my views may be justified.

It is apparent from this record that, when the Canadian currency began to depreciate, it was to the interest of Canadian shippers to prepay the freight on shipments into the United States in Canadian funds. This was the practice until the American roads demanded that their share of the rates be paid in American dollars. The Canadian roads thereafter, by refusing to accept prepayment on international shipments, and requiring payment at destination in American funds, not only protected themselves from a loss by reason of this requirement of the American roads, but actually made a profit; that is, for their part of the service performed in Canada they received a higher rate than the Canadian tariff prescribed, and higher than they were permitted to charge for the same service from point of origin in Canada to the international boundary line. This practice, in effect, required the shipper to pay a higher rate than that prescribed by the Canadian tariff, and compelled him to stand this loss due to the difference in exchange that the railroads complained of before they were permitted to force payment of freight in American funds at destination in the United States. Logically the same arguments can be made against the present practice, and with the same force that was made by the Canadian railroads previous to the change.

Commissioner Carvell of the Canadian Commission, in discussing the surcharge order made for the protection of the Canadian roads, recognized the injustice of this position. He says: "At first the exporters demanded the right to prepay the whole rate in Canadian funds, which of course would give them an advantage in that they would be able to pay the American end of the haul in Canadian funds, which were then as now worth less than the American dollar. Shortly thereafter, however, the demand from all classes of business men was that the Canadian end of the haul should be paid in Canadian funds, and, to the ordinary business man, this seems absolutely fair and reasonable."

Further on he says that "the railway companies were told that a solution of some kind must be found for the difficulty, and one which would in the end practically amount to paying the Canadian end of the haul in Canadian funds."

In another opinion Commissioner Carvell said (Transcript, p. 104): "My first impression was, and I have not changed my views, that, as a matter of equity, the Canadian shipper should be allowed to prepay his freight for the Canadian portion of the journey in Canadian money and the American portion in American funds."

And again: "The principal discussion between the Board and the railway companies was as to what would be a fair surcharge to be added to the rate which would place the Canadian railway in a position to receive payment of the whole charge in Canadian funds, and pay the American share of their American connections in American funds."

The sole object of the hearings on this question held before the Canadian Commission, and the orders and opinions resulting therefrom, was to protect the Canadian railroad from having to stand a loss by reason of this difference in exchange. But nowhere does the Commission indicate that as a matter of law or equity the Canadian railroad was entitled to anything more than their prescribed division in Canadian funds. Certainly the question cannot be rightly settled in principle by simply shifting the loss from the railroads to the shipper.

The majority opinion rightly suggests some very practical difficulties, such as dislocation of rate structures, that would otherwise result. I respectfully submit, however, that those questions are for the Interstate Commerce Commission, and are not the concern of this court.